Rockingham
No. 97-156

## THE STATE OF NEW HAMPSHIRE

v.

## DANNY LOCKE

December 3, 1999

*Philip T. McLaughlin*, attorney general (*Joseph N. Laplante*, assistant attorney general, on the brief and orally), for the State.

*Donald E. Bisson*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

BRODERICK, J. In this interlocutory appeal, *see* RSA 606:10 (1986), the State challenges the Superior Court's (*Nadeau*, C.J.) rulings that the defendant, Danny Locke, could not be charged as an accomplice to second degree murder, *see* RSA 630:1-b, I(b) (1996); RSA 626:8, II(c) (1996), and that evidence of an intercepted conversation between the defendant and his co-defendant should be suppressed based on New Hampshire's wiretap statute, RSA ch. 570-A (1986 & Supp. 1999). We reverse and remand.

I

Viewed in the State's favor, the record before us reveals the following. In June 1996, the body of Roland LaBranche was discovered on Pierce Island, an island-park in Portsmouth Harbor. LaBranche had been severely beaten. A few days later, the co-defendant, Christopher Rockett, was interviewed by the police regarding the homicide. During that interview, Rockett related that

he and the defendant had approached LaBranche, who was sitting in his car, and subsequently proceeded with him on foot to a location further down the island. Rockett revealed that, as the three of them walked down a foot path, he and the defendant struck LaBranche and kicked him after he fell to the ground. Rockett also confessed that he emptied LaBranche's pockets before leaving the scene.

After their interview with Rockett, the police went to the defendant's home. The defendant agreed to accompany the police to the State police headquarters to be interviewed. During the interview, the defendant provided a similar account of LaBranche's fate but denied participating in the physical assault, stating only that he held LaBranche's head as a comfort, telling him, "It will be over in a minute." Several times during the interview, the defendant insisted on speaking with Rockett face to face.

The police asked Rockett if he would speak with the defendant, and he agreed. While there is evidence that Rockett had told the police earlier in the evening that he was willing to assist in the investigation, it is unclear whether the police expressly told Rockett at this point that law enforcement personnel would be intercepting his conversation with the defendant. In the presence of two police detectives Rockett encouraged the defendant to tell "everything," and the defendant responded by stating that "we had an agreement never to talk about this to anybody," without admitting to any greater involvement. The encounter and conversation were also being observed and overheard by a member of the attorney general's office in an adjacent observation room. After Rockett left the room, the defendant, addressing a detective, continued to deny any participation in the assault on LaBranche. The police again asked Rockett if he would be willing to speak with the defendant. He was advised that no police officers would be in the room with them and that the conversation would be "monitored" by law enforcement personnel. There is also evidence that Rockett was informed that the police would be in a position to "both see and hear" the conversation. Rockett then met with the defendant a second time, during which the defendant made several inculpatory statements. Later, the police questioned the defendant alone, and he acknowledged that he participated in the physical assault. The defendant was subsequently indicted for one count of robbery, RSA 636:1, I(a), III(c) (1996), and one count of reckless second degree murder, RSA 630:1-b, I(b), both as an accomplice and a principal.

## II

We first address the State's argument that the trial court erred in ruling that the defendant could not be charged as an accomplice to reckless second degree murder.

The murder indictment alleged that the defendant

acting in concert with and aided by Christopher Rockett . . . recklessly caused the death of [the victim], under circumstances manifesting an extreme indifference to the value of human life, by beating and kicking him about the head and neck.

The defendant does not dispute that, by alleging that he committed the murder "in concert with and aided by [the co-defendant]," the indictment charged the defendant as both an accomplice and a principal. *See State v. Sinbandith*, 143 N.H. 579, 584, 729 A.2d 994, 998 (1999). Moreover, there is no disagreement that the defendant's culpability as an accomplice must be measured by the standards set forth in the accomplice liability statute. *See* RSA 626:8 (1996); *State v. Jansen*, 120 N.H. 616, 618-19, 419 A.2d 1108, 1110 (1980).

The defendant moved to strike the "in concert with and aided by" allegation as surplusage, arguing that the statute does not allow one to be charged as an accomplice to a crime requiring proof of recklessness as the culpable mental state. The trial court agreed, relying on *State v. Etzweiler*, 125 N.H. 57, 480 A.2d 870 (1984), and struck the quoted language from the indictment. We agree with the State that the trial court erred in doing so.

The accomplice liability statute provides that an individual may be held criminally liable for the conduct of another when he or she "is an accomplice of [another] in the commission of the offense." RSA 626:8, II(c). Accomplice liability under RSA 626:8, II(c) is defined in two sections, RSA 626:8, III and IV, that state, in pertinent part:

III. A person is an accomplice of another person in the commission of an offense if:

. . . [w]ith the purpose of promoting or facilitating the commission of the offense, he . . . aids . . . such other person in planning or committing it . . . .

IV. When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

■ We have previously determined that sections III and IV must be read together such that the State must prove the elements under both sections III and IV when charging a person as an accomplice under RSA 626:8, II(c). *See Etzweiler*, 125 N.H. at 63, 480 A.2d at 873; *see also State v. Horne*, 125 N.H. 254, 256, 480 A.2d 121, 122 (1984). "Section IV sets forth the elements of the substantive offense that must be present in order to charge the accomplice." *Etzweiler*, 125 N.H. at 63, 480 A.2d at 873. Section III, however, "sets forth the elements which must be present above, beyond, and regardless of the substantive offense." *Id.* Specifically, the State must establish "that the accomplice acted with the purpose of promoting or facilitating the commission of the substantive offense." *Id.* at 63, 480 A.2d at 874. This requires the State to prove "that the accomplice's acts were designed to aid the primary actor in committing the offense and that the accomplice had the purpose to make the crime succeed." *Id.* at 63-64, 480 A.2d at 874 (citation and quotation omitted).

We agree with the defendant that *Etzweiler* controls the outcome in this case. We disagree, however, with the defendant's contention that *Etzweiler* precludes accomplice liability for aiding in any crime requiring a reckless *mens rea*.

In *Etzweiler*, we considered whether a defendant could be charged as an accomplice to negligent homicide under the accomplice liability statute and determined that, as a matter of law, a defendant could not be an accomplice to negligent homicide. *Id.* at 65, 480 A.2d at 874-75. We reasoned that the State could not establish that Etzweiler's acts were designed to aid the principal in committing negligent homicide as required under section III because under the negligent homicide statute, the principal must be *unaware* of the risk of death. *See id.* Thus, we concluded that it was impossible for Etzweiler to intentionally aid the principal in the commission of a crime which the principal was unaware he was committing. *See id.* This result, however, does not follow when the underlying crime is reckless homicide.

Reckless homicide requires that a person cause the death of another "recklessly under circumstances manifesting an extreme indifference to the value of human life." RSA 630:1-b, I(b). A person acts recklessly under the reckless homicide statute "when he is *aware* of and *consciously disregards* a substantial and unjustifiable risk" that death will result from his conduct. RSA 626:2, II(c) (1996) (emphasis added). Thus, unlike negligent homicide, the principal must be aware of the risk of death. It is entirely possible that the defendant could intentionally aid Rockett in the commission of a

crime under circumstances where Rockett was aware of a substantial and unjustifiable risk of death which he chose to disregard. Accordingly, we conclude that as a matter of law, a person can act with the purpose of promoting or facilitating the commission of a reckless homicide and thus be charged as an accomplice to such crime. *See Etzweiler*, 125 N.H. at 63, 480 A.2d at 874.

■ Our analysis is consistent with our prior case law examining accomplice liability. For example, in *Horne*, 125 N.H. at 256, 480 A.2d at 122, we followed *Etzweiler* and specifically observed that the purported facts could support a conviction for accomplice to second degree assault in which recklessness was the charged *mens rea*. Thus, less than two months after *Etzweiler* was decided, we endorsed accomplice liability for reckless crimes. We reversed the defendant's conviction in *Horne* only because the indictment failed to allege that the defendant acted with the purpose of promoting or facilitating the underlying crime as required by RSA 626:8, III. *See id.* Accordingly, the trial court erred in striking from the murder indictment the "in concert with and aided by" allegation.

## III

We next address the State's argument that the trial court erred in suppressing evidence of intercepted statements made by the defendant and co-defendant Rockett based on the State wiretap statute, RSA chapter 570-A. The State argues that the statements at issue do not constitute "oral communications" as defined under RSA 570-A:1, II, and thus are not afforded its protection. Alternatively, the State asserts that Rockett consented to the interception as required by RSA 570-A:2, II(d).

Relying on the wiretap statute, the defendant filed a motion to suppress statements made by him and Rockett which the police overheard by using electronic amplification. Specifically, he asserted that although Rockett agreed to have the conversations "monitored" by law enforcement personnel, the police failed to inform Rockett that the conversations would be intercepted through use of an electronic device, and thus Rockett's "consent" was invalid under the statute. The trial court agreed. It observed that "[Rockett] was not told about the process of monitoring — or that there was any recording or that there was any electronics, but rather that the conversation would be monitored" and thus concluded that

> Rockett was [not] sufficiently provided with information to
> enable him to make a voluntary decision to consent to the

type of monitoring contemplated by the statute. ["Monitor" is] a word of art that was used and known by police but not by Mr. Rockett as to what it encompassed.

■ We first dispose of the State's argument that the statements at issue are not protected by the wiretap statute because they do not constitute "oral communications." We agree with the defendant that the argument was not preserved below. In its objection to the defendant's motion to suppress, the State argued only that Rockett consented to the interception. Moreover, when the parties asked the trial court to rule on the motion during a February 1997 pretrial hearing, the State failed to supplement its written objection to include an "oral communications" argument. Although the State raised the "oral communications" issue during a January 1997 evidentiary hearing, it was addressing only the defendant's initial interview with the police prior to any interaction with Rockett. Because the State makes the "oral communications" argument regarding an encounter between the defendant and Rockett for the first time on appeal, it is not preserved for review. *See State v. Sterndale*, 139 N.H. 445, 448, 656 A.2d 409, 411 (1995).

We turn to the State's remaining argument that the trial court erred in ruling that RSA 570-A:2, II(d) requires law enforcement to expressly inform an individual of the manner in which they intend to intercept a targeted communication in order to obtain valid consent. We agree.

At the outset, we reject the defendant's contention that the trial court's suppression of the statements at issue on independent and alternative grounds precludes us from reaching the wiretap issue. While the defendant concedes that the court's separate suppression ruling does not reach the State's use of the statements for impeachment purposes, he argues that "the State is asking this court to speculate about what will happen at trial and what the trial court's response will be." If we failed to reach the validity of the trial court's ruling on the wiretap statute, the State might be foreclosed from using the statements for impeachment purposes. *See* RSA 570-A:6. The parties, however, have not addressed whether RSA 570-A:6 would exclude use of the statements for impeachment purposes. The possibility that the statute may preclude impeachment use of the statements coupled with the purposes of the State's interlocutory appeal, *see* RSA 606:10, VI, persuade us to address the State's challenge to the wiretap ruling.

■ The wiretap statute permits law enforcement officers who are investigating certain offenses "to intercept . . . [an] oral

communication" if, *inter alia*, "one of the parties to the communication has given prior consent to such interception." RSA 570-A:2, II(d). "Consent" is not defined under the statute. "Intercept," however, is defined to mean "the aural or other acquisition of, or the recording of, the contents of any telecommunication or oral communication through the use of any electronic, mechanical, or other device." RSA 570-A:1, III. Requiring law enforcement to inform a person of the precise method by which a targeted conversation will be intercepted would mandate a hypertechnical reading of "consent to such interception" under RSA 570-A:2, II(d), which we are reluctant to adopt without express statutory language evincing such legislative intent. Moreover, such a constrained reading would not further the purpose of the statute, which is "to maintain a proper balance between the duty of the State to protect the public and the individual's right of privacy and free expression." *State v. Lee*, 113 N.H. 313, 315, 307 A.2d 827, 828 (1973). Rather, we conclude that consent is valid under RSA 570-A:2, II(d) when the surrounding circumstances demonstrate that the consenting party knew that law enforcement personnel were intercepting the conversation with an "electronic, mechanical or other device," RSA 570-A:1, III, even if the precise method of interception is not disclosed.

The defendant argues that whether consent is valid under the wiretap statute should be measured by the constitutional parameters set forth within the Fourth Amendment. While some courts interpreting the similar federal consent provision may adopt this view, we are persuaded by the reasoning of other courts that follow *United States v. Bonanno*, 487 F.2d 654 (2d Cir. 1973).

> [T]he extent of proof required to show that an informer consented to the monitoring or recording of a telephone call is normally quite different from that needed to show consent to a physical search, whether by the defendant himself or by some person in a position to give an effective one. In cases involving physical search, the person alleged to have consented is doing something apparently contrary to his own interests or to those of another who often is in some way connected with him. An informer's consent to the monitoring or recording of a telephone conversation is an incident to a course of cooperation with law enforcement officials on which he has ordinarily decided some time previously and entails no unpleasant consequences to him. Hence, it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about.

*Bonanno*, 487 F.2d at 658-59 (citations omitted); *see, e.g., Griggs-Ryan v. Smith*, 904 F.2d 112, 117 (1st Cir. 1990) (citing *Bonanno*); *United States v. Glickman*, 604 F.2d 625, 633 (9th Cir. 1979), *cert. denied*, 444 U.S. 1080 (1980) (same); *United States v. Edmond*, 718 F. Supp. 988, 992 (D.D.C. 1989) (same). Our recognition that the wiretap statute generally "protects the individual's right to privacy to a greater degree than the United States Constitution or [its] federal statut[ory] [counterpart]," *State v. Ayres*, 118 N.H. 90, 91, 383 A.2d 87, 88 (1978) (superseded by statute on other grounds), does not require that we incorporate constitutional principles into the wiretap statute as foundational requisites.

█ The record before us prevents us from determining whether Rockett's consent was valid under RSA 570-A:2, II(d) even though certain facts are undisputed. The defendant's motion to suppress alleging violation of the wiretap statute requested the trial court to suppress "any evidence of *conversations* between [him] and Christopher Rockett at the State Police Headquarters in the early morning of July 3, 1996," (emphasis added), ostensibly referring to both encounters. The State's objection, however, appears to address only the second encounter. Moreover, the trial court's brief ruling refers only to a "conversation," and does not specify whether one or both of the conversations were suppressed. The parties further this uncertainty on appeal by failing to distinguish between the two conversations, referring vaguely to a singular "conversation" throughout their respective briefs. Therefore, it is impossible for us to discern which conversation was suppressed. Moreover, while the trial court apparently accepted the evidence that Rockett was informed that one of the conversations would be "monitored" by law enforcement, it never made any factual findings regarding whether the surrounding circumstances shed light on Rockett's understanding of the term "monitor." Having determined that the trial court erroneously required the State to demonstrate that the police informed Rockett as to the "process" or "type" of monitoring, we remand for the court to utilize the standard set forth herein.

*Reversed and remanded.*

All concurred.