Slater v. Verizon                                    CV-04-303-SM   03/03/05

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Jonathan B. Slater,
      Plaintiff

      v.                                            Civil No. 04-303-SM
                                                    Opinion No. 2005 DNH 023
Verizon Communications, Inc.,
      Defendants


**O R D E R**


In this case, removed from the New Hampshire Superior Court, Jonathan Slater sues for damages arising from the termination of his employment by Telesector Resources Group d/b/a Verizon Services Group ("Verizon"). Before the court is Verizon's motion to dismiss seven of the nine counts in the complaint. Plaintiff objects. For the reasons given below, defendant's motion to dismiss is granted in part and denied in part.


**Standard of Review**

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). When considering a motion to dismiss under Rule 12(b)(6), the court must "accept as true the factual allegations of the complaint and construe all reasonable inferences therefrom in favor of [plaintiff]." Perry v. N.E. Bus. Serv., Inc., 347 F.3d 343, 344 (1st Cir. 2003) (citing Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998)). "A district court may grant a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted only if 'it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.'" Pomerleau v. W. Springfield Pub. Sch., 362 F.3d 143, 145 (1st Cir. 2004) (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

## Background

The facts of this case, as drawn from plaintiff's complaint, are as follows.

Slater was hired by Verizon as a financial analyst in December, 1996. (Compl. ¶¶ 4-5.) At all times relevant to this

matter, he has also served as an officer in the New Hampshire Army National Guard, rising to the rank of Major. (Compl. ¶ 3.)

In early October, 2001, immediately following the September 11th terrorist attacks in New York, Pennsylvania, and Washington, D.C., Slater was called to active duty. (Compl. ¶ 10.) He promptly notified several Verizon officials of his activation, including his direct superior, Nicholas Bonanno (Customer Operations Financial Manager), Thomas S. Gardnier (Customer Operations Area Manager), and Ellen Connors (Executive Assistant to Edward Kmiec, who was superior to Bonanno and Gardnier). (Compl. ¶¶ 10-13.) (Plaintiff does not, however, allege that he submitted a Verizon military leave form, as is apparently required by his employer's policies. (Compl. ¶ 6.))

Slater served on active military duty for approximately eight months, all in New Hampshire, as his assignment involved securing airports in Manchester, Newington, and Lebanon. (Compl. ¶¶ 17, 31.) While on active duty, Slater continued to do work for Verizon. In the words of his complaint:

3

> Mindful of the needs of his employer, Major Slater felt compelled to continue to perform work for Verizon while he was on active military duty.

> . . .

> Mr. Bonanno accepted Major Slater's offer and allowed him to perform work for Verizon continuously while Major Slater was on active military duty. Major Slater, <u>inter alia</u>, completed reports, analyzed data, helped negotiate a large fire casualty loss, and attended meetings in and outside of New Hampshire.

(Compl. ¶¶ 19, 22.) While on active duty, and while continuing to perform work for Verizon, Slater maintained contact with Bonanno and others by telephone, e-mail, and in person. (Compl. ¶ 23.) He submitted expense reimbursement requests, which were approved by Verizon. (Compl. ¶ 24.) Bonanno also approved the installation of a DSL line to Slater's home, at Verizon's expense, to facilitate Slater's ongoing work for Verizon. (Compl. ¶ 25.) Slater performed at least some work for Verizon during every pay period he was on active duty. (Compl. ¶ 30.)

While Slater was on active duty, he received his full civilian salary from Verizon, in addition to his military pay. (Compl. ¶ 27.) Under Verizon's "Military Leave Policy," employees called to active military duty were entitled to be paid

4

compensation to supplement their military pay, without any obligation to perform work for Verizon while on military duty. (Compl. ¶¶ 15-16.)

Slater's military duty ended, and he returned to full-time work for Verizon, in May, 2002. (Compl. ¶ 31.) In August, 2002, Verizon began an investigation into whether Slater had defrauded the company during the time he was on active military duty. (Compl. ¶ 34.) Slater cooperated with the investigation, which took approximately one year to complete. (Compl. ¶¶ 34-35.) In July, 2003, Slater informed Richard Jimmo, Verizon's acting finance manager, that he intended to return to active military duty. (Compl. ¶ 38.) In August, 2003, approximately thirty days after informing Jimmo of his plans to return to active duty, Slater was discharged from Verizon. (Compl. ¶ 6.)

Slater's notice of termination stated that he had "failed to submit the required Verizon Military Leave forms after being activated for Military duty." (Compl. ¶ 6.) The termination notice further stated: "During the period when you were on active military duty, you also collected your full Verizon salary in

5

addition to being paid for military duty.  These actions are direct violations of Verizon's Code of Business Conduct, and therefore, your employment with Verizon is being terminated effective today."  (Compl. ¶ 6.)  Verizon had a company policy related to recovery of overpayment of wages, but Slater was not offered an opportunity under that policy to repay the amounts in dispute.  (Compl. ¶¶ 39-40.)

When asked by potential employers why he left Verizon, Slater has given the reasons set out in his notice of termination.  (Compl. ¶ 43.)  Verizon, as well, has advised potential employers of those reasons.  (Compl. ¶ 44.)

Based upon the foregoing, Slater asserts claims for wrongful termination (Counts A-D), violation of N.H. REV. STAT. ANN. ("RSA") § 110-C (Count E), violation the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq. (Count F), violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (Count G), and defamation (Counts H and I). Defendant moves to dismiss the claims for wrongful termination,

violation of RSA 110-C, violation of the FLSA, and one of the defamation claims (Counts A-E, G, and I).

## Discussion

Count A

In Count A, plaintiff asserts a claim for wrongful termination, based upon an allegation that he was discharged because of his membership in, and his intent to return to active military duty with, the Army National Guard. Defendant moves to dismiss on grounds that New Hampshire law bars plaintiff from asserting a common law wrongful discharge claim, due to the availability of an adequate federal statutory remedy under USERRA.

New Hampshire's common law of wrongful termination is fairly summarized as follows:

> In order to have a valid claim for wrongful termination, the plaintiff must show: "one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn."

Wenners v. Great State Bevs., Inc., 140 N.H. 100, 103 (1995) quoting Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992)).  Moreover, "case law [in New Hampshire] makes clear that the public policy violated by a wrongful discharge 'can be based on statutory or nonstatutory policy,'" Karch v. BayBank FSB, 147 N.H. 525, 537 (2002) (quoting Cilley v. N.H. Ball Bearings, Inc., 128 N.H. 401, 406 (1986)).  And, the requisite public policy apparently can arise from federal as well as state statutory provisions.  See, e.g., Bliss v. Stow Mills, Inc., 146 N.H. 550 (2001).

Defendant argues that the wrongful discharge claim in Count A must be dismissed, because the public policy on which it is based arises from USERRA, and USERRA provides plaintiff with an adequate statutory remedy.  The New Hampshire Supreme Court has explained, as a general proposition, that "a plaintiff may not pursue a common law remedy where the legislature intended to replace it with a statutory cause of action."  Wenners, 140 N.H. at 103 (citing Howard v. Dorr Woolen Co., 120 N.H. 295, 297 (1980)).  But there appears to be no reported decision by the New Hampshire Supreme Court in which a plaintiff's common law

wrongful discharge claim has been dismissed due to the existence of "an adequate statutory remedy."[1]  Indeed, in two recent cases, plaintiffs have been allowed to pursue common law wrongful discharge claims in which the public policy element has been

_____

[1] In Wenners, the defendant sought dismissal of a wrongful discharge claim on grounds that plaintiff asserted that he had been dismissed in contravention of a public policy arising from the federal bankruptcy code.  140 N.H. at 102.  The Supreme Court held that because the bankruptcy code prohibited the employer's alleged conduct, but "does not evidence an intent to supplant a common law cause of action for wrongful termination," id. at 103, the code both provided an adequate public policy to support a wrongful discharge claim, and did not bar the plaintiff's common law cause of action.  Id. at 104.  In Howard, the principal opinion on which Wenners relies for the proposition that "a plaintiff may not pursue a common law remedy where the legislature intended to replace it with a statutory cause of action," 140 N.H. at 103, the plaintiff asserted a claim for wrongful discharge, alleging he had been discharged "because of his age, his suffering from angina, and for the purpose of denying him his accrued retirement benefits," Howard, 120 N.H. at 297.  In affirming the trial court's decision to grant the defendant's motion to dismiss, the Supreme Court explained that discharge due to sickness or due to age falls outside the category of discharge for "perform[ing] an act that public policy would encourage, or refus[ing] to do that which public policy would condemn."  Id. (citations omitted).  Explaining that getting sick or growing old are not acts that public policy would encourage, for purposes of a wrongful discharge claim, the court went on to observe that "[a] discharge due to sickness . . . is generally remedied by medical insurance or disability provisions in an employment contract," id., and that "[t]he proper remedy for an action for unlawful age discrimination is provided for by statute," id. (citations omitted).  (However, because the plaintiff's claims were dismissed for failing to allege an adequate public policy, the existence of a statutory remedy for age discrimination was not necessary to the court's decision.)

9

supplied by statutes that also provided specific remedies.  In

Karch, the plaintiff was allowed to pursue a wrongful discharge

claim based upon an alleged violation of a public policy

established by the New Hampshire Whistleblowers' Protection Act.[2]

147 N.H. at 537.  And in Bliss, the plaintiff was allowed to

pursue a wrongful discharge claim that involved a public policy

expressed by the federal Surface Transportation and Assistance

Act of 1982 ("STAA").[3]  146 N.H. at 556 (holding that the STAA

did not preempt common law cause of action for wrongful

discharge, and regarding preemption analysis as dispositive of

defendant's Wenners argument).

Based upon Karch and Bliss, it is evident that the rule

established in Wenners provides no basis for dismissing Count A.

---

[2] The Whistleblowers' Protection Act, RSA 275-E, provides, inter alia, that an employee claiming to have been discharged for reporting, in good faith, an employer's violation of the law, is entitled to a hearing before the commissioner of labor and an appeal pursuant to RSA 541.  The statute affords remedies in the form of back pay, reinstatement, and other equitable relief.

[3] The STAA contains an anti-retaliation provision that gives truck drivers the right to file complaints with the Secretary of Labor if they believe they have been discharged for reporting their employers' STAA violations.  Bliss, 146 N.H. at 552.

Moreover, while USERRA provides individuals such as plaintiff with a cause of action, it also specifically provides that

> [n]othing in this chapter shall supercede, nullify or diminish any Federal or State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that establishes a right or benefit that is more beneficial to, or is in addition to, a right or benefit provided for such person in this chapter.

38 U.S.C. § 4302(a). The federal statute providing the public policy for the wrongful discharge claim in Bliss appears to contain no such provision and, therefore, seems even less amenable than USERRA to parallel state and federal remedies. Given the rather plain language of USERRA, it is apparent that Congress did not intend to replace any common law remedy that might also be available to plaintiff.[4] Thus, neither the rule stated in Wenners, nor preemption principles, provide a basis upon which to dismiss Count A.

---

[4] USERRA does have a preemption provision, but that provision applies only to state laws that limit the rights or benefits available thereunder, or that impinge upon the exercise of those rights, see 38 U.S.C. § 4302(b), not to state laws that expand upon or supplement the rights available under the USERRA.

11

None of the three cases cited by defendant requires, or even supports, a contrary result.  In <u>Harris v. City of Montgomery</u>, 322 F. Supp. 2d 1319, 1329 (M.D. Ala. 2004), the court granted defendants' motion for summary judgment on plaintiff's Fourteenth Amendment equal-protection claim, arising from alleged discrimination based upon the plaintiff's military status, on grounds that the constitutional claim, if one existed at all, duplicated a USERRA claim the plaintiff had asserted in the same action.  In <u>Satterfield v. Borough of Schuylkill Haven</u>, 12 F. Supp. 2d 423 (E.D. Pa. 1998), the court relied upon the doctrine of constitutional claim preemption to dismiss the plaintiff's equal-protection claim, brought under 42 U.S.C. § 1983, ruling that the plaintiff could not bypass USERRA's "comprehensive enforcement mechanism . . . by alleging a constitutional violation and bringing suit directly under § 1983."  <u>Id.</u> at 437. While both <u>Harris</u> and <u>Satterfield</u> stand for the proposition that USERRA "provides a comprehensive remedial scheme for discrimination on the basis of military service," <u>Harris</u>, 322 F. Supp. 2d at 1329, thus depriving a USERRA plaintiff of a separate constitutional claim arising out of the same operative facts, neither case holds that Congress intended USERRA to replace

12

common law remedies, which, under New Hampshire law (i.e.,
Wenners), is the determinative issue.

Similarly, in Schmauch v. Honda of America Manufacturing,
Inc., 311 F. Supp. 2d 631 (S.D. Ohio 2003), the court relied upon
Ohio law to dismiss the plaintiff's common law wrongful discharge
claim as duplicative of his USERRA claim, but did so because
USERRA "provides adequate remedies such that the public policies
established by the USERRA are not jeopardized by denying Schmauch
the ability to pursue a tort action for a violation of public
policy," id. at 635.  But again, the determinative factor under
New Hampshire law, as established in Wenners, is not whether
USERRA provides an "adequate remedy," but rather, whether the
legislature, in this case the U.S. Congress, intended to replace
common law remedies, a question not addressed by the court in
Schmauch, and a question specifically answered by the Congress:
it had no such intent; in fact it intended that no such remedies
would be adversely affected.

Count B

In Count B, plaintiff makes a claim for wrongful termination, asserting he was discharged because he insisted upon being paid his full salary for each pay period in which he performed work, as was his right as an exempt, salaried employee. Defendant moves to dismiss on grounds that New Hampshire law bars plaintiff from making a common law claim, due to the existence of a statutory remedy under the Fair Labor Standards Act. Defendant is entitled to dismissal of Count B, but for a different and more fundamental reason than the one identified, namely, the absence of a public policy that was offended by his alleged dismissal for demanding to be paid in full for every pay period during which he performed any work for his employer.

"[O]rdinarily, the issue of whether a public policy exists is a question for the jury, [but] at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law . . . ." Short, 136 N.H. at 84 (citing Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 924 (1981)). This is such a time. While the "case law [in New Hampshire] makes clear that the public policy violated by a

14

wrongful discharge 'can be based on statutory or nonstatutory policy,'" Karch, 147 N.H. at 537 (citation omitted), the statute to which plaintiff looks for a public policy to support his claim simply does not provide the right he thinks it does. The FLSA does not grant exempt salaried employees a right to be paid their full salaries for every pay period during which they perform any work for their employers.

The source of confusion is probably the Code of Federal Regulations, which does include the following language: "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." 29 C.F.R. § 541.602 (previously codified at 29 C.F.R. § 541.118). However, the quoted language does not confer a right upon salaried employees; it is actually part of the "salary basis" test for determining whether an employee is exempt from the FLSA overtime requirements. It provides that if an employer wants to treat an employee as exempt from the FLSA's overtime requirements, then that employee must be paid on a salary basis rather than an hourly wage basis. Because the FLSA does not afford exempt employees the right to be paid

15

their full salaries for every period in which they perform some work for their employers, the FLSA does not provide a statutory basis for the public policy upon which plaintiff relies to support his wrongful discharge claim in Count B. And, because plaintiff does not attempt to suggest a nonstatutory basis for that public policy, Count B must necessarily be dismissed for failure to identify a public policy that encouraged him to insist on full payment of his civilian salary while on military duty.

Count C

In Count C, plaintiff asserts a claim for wrongful termination, saying he was fired because he refused to misstate the nature of the work he did for Verizon while on active military duty, and because he insisted upon payment for that work. Defendant moves to dismiss on grounds that plaintiff has failed to identify any public policy sufficient to support a wrongful discharge claim, and that even if he had identified an adequate public policy, Count C is barred by virtue of the comprehensive remedial schemes available under USERRA and the FLSA.

16

To the extent Count C is based upon plaintiff's alleged insistence on being paid salary he was due, that claim is subsumed in Count B and the analysis set forth above applies equally to Count C. To the extent Count C is based upon plaintiff's alleged "refus[al] to misstate the nature of the work he performed for Verizon while on active military duty" (Compl. ¶ 68), defendant is entitled to dismissal. Nowhere in his complaint does plaintiff identify any instance in which he was asked to misstate anything to anyone, much less that he refused to do so. Defendant makes that point in its motion to dismiss, and it is persuasive.

Plaintiff counters with an argument that is difficult to paraphrase and so, is set out in full:

> Reading plaintiff's Count C and giving him the benefit of all reasonable inferences related thereto, the Court can assume that plaintiff's claim is as follows. Major Slater was asked to work for Verizon while he was on active military duty because his work group was understaffed. Major Slater refused to work for Verizon in secret, but instead insisted that he work openly and be paid for his work. Later, Major Slater's direct superior, Bonanno, disclaimed knowledge that Slater was being paid. Major Slater, who was the subject of an investigation, refused to disclaim that he was paid or that he worked without permission. In other words, Major Slater acted truthfully in working,

17

> demanding that he be paid, and in asserting that he
> worked with permission and for pay during the
> investigation.  He was then fired for not filing a
> military leave form and for collecting his Verizon
> salary while on active duty.
>
> Plaintiff's claim assumes that he would not have
> been fired had his statements been believed by Verizon.
> Verizon's bad faith is established by Bonanno's failure
> to support Slater when Slater had Bonanno's direct
> permission to work and be paid.  The act that triggered
> the termination was Slater's telling the investigators
> truthfully what he had done.

(Pl.'s Mem. of Law at 16.)

Whatever else plaintiff may be asserting in his memorandum of law, he sheds no light on the essential claim in Count C, that he was terminated because he refused to misstate the nature of the work he did for Verizon while on military duty.  Plaintiff does not indicate when (or even that) he was asked to make a false statement.  In the passage quoted above, plaintiff says he refused to work in secret, but not that he was ever asked to do so.  And at the end of the passage, he claims he was terminated for telling the truth to investigators, but does not claim that he was ever asked, by anyone, to tell investigators anything other than the truth.  Thus, plaintiff has failed to allege facts sufficient to support an assertion that he was terminated for

18

refusing to misrepresent the truth, either at the time of his military service or during the course of the investigation of his having worked for Verizon while on active military duty.

What plaintiff does appear to argue is that he was terminated for telling the truth when questioned by Verizon investigators. But, based upon the facts alleged, it would be more accurate to say that plaintiff told the truth and was then terminated - not so much for telling the truth, but because the truth justified his discharge in the eyes of his employer. Consider the following scenario. An employee steals from his employer. The employer investigates. The employee truthfully admits his theft, and is terminated. The employee has been terminated for stealing, not for "telling the truth" to investigators. So it is in this case; plaintiff has failed to allege any facts to support a claim that he was terminated for "telling the truth," but only facts supporting a conclusion that he was terminated for collecting his full Verizon salary while on active military duty.

19

Count D

In Count D, plaintiff asserts a claim for wrongful termination, based upon an allegation that he was discharged as a result of an unfair investigation. Defendant moves to dismiss on grounds that plaintiff has failed to identify a public policy adequate to support his claim.

"Inquiry into the public policy component must focus on the acts of the employee and their relationship to public policy, not on the mere articulation of a public policy by the employee." Frechette v. Wal-Mart Stores, Inc., 925 F. Supp. 95, 98 (D.N.H. 1995) (citation omitted). Here, Count D alleges no conduct by plaintiff, favored by public policy, that led to his dismissal by Verizon. To the contrary, Count D focuses entirely upon Verizon's alleged malfeasance in the investigation it conducted into plaintiff's activities. Accordingly, plaintiff has failed to state a claim on which relief can be granted.

Count E

Defendant moves to dismiss Count E, plaintiff's RSA 110-C claim, on grounds that plaintiff has failed to exhaust his

administrative remedies. Defendant, however, is entitled to dismissal for a different and more fundamental reason. Plaintiff has not alleged – and could not allege in good faith – that he was called to active duty by the state, rather than by the federal government, which is a necessary prerequisite to his having any rights under RSA 110-C. As the statute expressly provides, "[i]t is the intention of this section to eliminate the differences in benefits, rights, and protections in employment between individuals called to active duty by the federal government and those called to active duty by the state." RSA 110-C:1, I. As plaintiff has not alleged that he was called to active duty by the state (and likely was not), he has no reemployment rights under RSA 110-C. Count E is dismissed.

Count G

In Count G, plaintiff asserts that Verizon violated his rights under the Fair Labor Standards Act by discharging him in retaliation for asserting, in good faith, his right under the FLSA to be paid his full salary for each pay period during which he performed any work for Verizon. Defendant moves to dismiss on grounds that: (1) generalized and/or informal complaints about

21

wages cannot give rise to retaliation claims under the FLSA; and (2) too much time elapsed between plaintiff's assertion of his right to be paid and his termination to support an inference of retaliation.

The anti-retaliation provision of the FLSA provides as follows:

[I]t shall be unlawful for any person-

. . .

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding . . .

29 U.S.C. § 215(a)(3). "The elements of a retaliation claim under the FLSA require, at a minimum, a showing that (1) the plaintiff engaged in a statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in protected activity." Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004) (citing Blackie v. Maine, 75 F.3d 716, 722 (1st Cir. 1996)). "[T]he assertion of statutory rights

22

. . . by taking some action adverse to the company . . . that is the hallmark of protected activity under § 215(a)(3)." Claudio-Gotay, 375 F.3d at 102 (quoting McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996); citing EEOC v. HBE Corp., 135 F.3d 543, 544 (8th Cir. 1998)).

Because the right plaintiff alleges he asserted – the right to be paid his full salary for each pay period during which he performed any work for Verizon – is not a right guaranteed under the FLSA, termination in retaliation for asserting that "right" cannot constitute a violation of the FLSA. That is, plaintiff asserted a "right" of his own invention, not a statutory right granted him under the FLSA. Accordingly, he has failed to state a valid retaliation claim under 29 U.S.C. § 215(a)(3).

However, even if the FLSA did extend the right on which Count G is based, defendant would still be entitled to dismissal. Plaintiff says that he "asserted his rights to his full salary in good faith" (Compl. ¶ 87) and that he "was terminated as a result of his good faith assertion of his rights under the Fair Labor Standards Act" (Compl. ¶ 88). Nowhere does the complaint offer

23

any additional allegations as to when, how, or to whom plaintiff asserted his rights to be paid his full salary. Moreover, in his memorandum of law, plaintiff does not argue that he was terminated because he asserted, prospectively, a right to be paid his full salary – by all accounts plaintiff had been paid his full salary long before he asserted any right to collect it. Rather, he urges "the Court to infer that plaintiff <u>objected to his termination</u> for collecting both military and Verizon pay because he in good faith believed he was entitled to receive both and had Bonanno's permission." (Pl.'s Mem. of Law at 22 (emphasis added).) Given plaintiff's characterization of his termination as "effective on the day it was announced to him," (Compl. ¶ 7), it appears that plaintiff is alleging that he asserted his FLSA rights in response to being terminated, not that he was terminated in response to asserting his FLSA rights.[5] While plaintiff alleges that he asserted his right to be paid his full salary, and argues that he had such a right under the FLSA,

---

[5] According to plaintiff, "there was nothing about which to complain until the investigation was completed and Slater was fired." (Pl.'s Mem. of Law at 22.) Thus, under plaintiff's own theory of the case, he never asserted his right to be paid full salary until <u>after</u> he had been terminated, thus undercutting any claim that his termination was in retaliation for asserting that right.

he does not allege that he ever informed Verizon that the source of the right he was attempting to assert was the FLSA.  Cf. Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 38 (1st Cir. 1999) (quoting plaintiff's letter to employer which states, inter alia, "I demand under FLSA that I be reclassified as non-exempt and paid for all overtime hours worked.").

Because plaintiff has failed to allege facts sufficient to support a claim that he was terminated because he asserted his rights as an employee, and because the right on which Count G is based does not exist under the FLSA, defendant is entitled to dismissal of Count G.

Count I

Count I is a defamation claim.  Plaintiff alleges that defendant effectively forced him to re-publish to potential employers the false and defamatory statements defendant made regarding its reasons for terminating his employment.  Defendant moves to dismiss on grounds that New Hampshire does not recognize a cause of action for "forced re-publication" or "compelled self-defamation."

25

The New Hampshire Supreme Court has yet to decide whether it will recognize a cause of action for defamation resulting from forced re-publication (or compelled self-defamation).  Thus, it is necessary to predict how that court would likely rule.  See Bogosian v. Woloohojian Realty Corp., 323 F.3d 55, 71 (1st Cir. 2003) (citing Nieves ex rel. Nieves v. Univ. of P.R., 7 F.3d 270, 274-75 (1st Cir. 1993)).

Plaintiff concedes that the self-defamation theory has been adopted by only a minority of the courts that have considered it.  Moreover, decisions adopting the theory generally pre-date those that reject it, evidencing a trend away from recognizing the theory of forced re-publication.  See Cweklinsky v. Mobil Chem. Co., 297 F.3d 154, 159 (2d Cir. 2002); but see Carey v. Mt. Desert Island Hosp., 910 F. Supp. 7, 11 (D. Me. 1995) ("A growing number of jurisdictions recognize the theory of compelled self-publication.) (citations omitted).  Illustrating the trend away from recognizing the self-defamation theory, one of the first states to adopt it, Georgia, has since reversed course.  See Sigmon v. Womack, 279 S.E.2d 254, 257 (Ga. Ct. App. 1981)

26

(overruling <u>Colonial Stores, Inc. v. Barrett</u>, 38 S.E.2d 306 (Ga. Ct. App. 1946)).

Not only does the doctrine represent a minority position, it has been largely discredited.  <u>See</u> <u>Olivieri v. Rodriguez</u>, 122 F.3d 406, 408 (7th Cir. 1997) (Posner, J.).  Among those jurisdictions explicitly rejecting the doctrine is Massachusetts, <u>see</u> <u>White v. Blue Cross & Blue Shield of Mass., Inc.</u>, 809 N.E.2d 1034 (Mass. 2004), a state to which the New Hampshire Supreme Court often turns for guidance when New Hampshire decisional law is not well-developed, <u>see</u>, <u>e.g.</u>, <u>In re Juvenile 2003-195</u>, 150 N.H. 644, 652 (2004); <u>Claremont Sch. Dist. v. Governor</u>, 138 N.H. 183, 186 (1993); <u>Chase v. Dorais</u>, 122 N.H. 600, 602 (1982).  The doctrine has also been rejected by the Restatement (Second) of Torts, <u>see</u> <u>White</u>, 809 N.E.2d at 1036, which the New Hampshire Supreme Court often recognizes as persuasive, <u>see</u>, <u>e.g.</u>, <u>Remsburg v. Docusearch, Inc.</u>, 149 N.H. 148, 158 (2003); <u>Buckingham v. R.J. Reynolds Tobacco Co.</u>, 142 N.H. 822, 829 (1998).

The signposts seem sufficiently clear; if the New Hampshire Supreme Court were presented with the question, it would decline

to adopt the self-defamation theory on which Count I is based. Accordingly, plaintiff has failed to state a claim on which relief can be granted.

## Conclusion

For the reasons given, defendant's motion to dismiss (document no. 7) is granted in part (Counts B, C, D, E, G, and I are dismissed), and denied in part (Count A is not dismissed).

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 3, 2005

cc:  Andru H. Volinsky, Esq.
     Brian H. Lamkin, Esq.
     Daniel P. Schwarz, Esq.
     Timothy P. Van Dyck, Esq.