Rockingham
No. 2001-311

### THE STATE OF NEW HAMPSHIRE

v.

### DANNY LOCKE

Argued: September 19, 2002
Opinion Issued: December 27, 2002

*Philip T. McLaughlin*, attorney general (*Malinda R. Lawrence*, senior assistant attorney general, on the brief and orally), for the State.

*Richard E. Samdperil*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

BROCK, C.J. The defendant, Danny Locke, was convicted of second degree murder, *see* RSA 630:1-b, I(b) (1996), robbery, *see* RSA 636:1, I(a) (1996), first degree assault, *see* RSA 631:1, I(a) (1996), and conspiracy to commit robbery, *see* RSA 629:3 (1996). On appeal, he argues that: (1) the Superior Court (*Nadeau*, C.J.) erroneously denied his motion to suppress statements he made without *Miranda* warnings; (2) the Superior Court (*McHugh*, J.) erroneously denied his motion to dismiss for violation of his right to a speedy trial; and (3) the Superior Court (*McHugh*, J.) erroneously prohibited cross-examination of a witness regarding the witness's credibility. We affirm.

The defendant's convictions arise out of the June 1996 robbery and homicide of Roland LaBranche on Pierce Island in Portsmouth. A more complete statement of the facts regarding the robbery and homicide appears in *State v. Locke*, 144 N.H. 348, 349-50 (1999).

*I. Custody*

The defendant first argues that the trial court should have suppressed statements that he made as a result of a custodial interrogation without the benefit of *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

On July 2, 1996, Portsmouth police officers obtained an admission from Christopher Rockett that he had participated in a robbery and homicide on Pierce Island in Portsmouth in the early morning hours of June 29, 1996. Rockett's statement implicated the defendant. Four police officers, dressed in plain clothes, drove in two unmarked police cars to the defendant's home in Concord on the evening of July 2, 1996. Detective Ronchi and Sergeant Yeardi knocked at the defendant's door, and upon answer displayed their badges, identified themselves and stated they were investigating an incident that had occurred in Portsmouth. The defendant agreed to accompany the officers to the State Police Headquarters in Concord.

The officers transported the defendant to State Police Headquarters on Hazen Drive. They told him, en route, that he was not in custody and that he was free to leave at any time. The defendant stated that he understood.

They arrived at State Police Headquarters at 10:05 p.m. The defendant walked without assistance into the unlocked building. He and the officers rode an elevator to the third floor and entered a polygraph room. The room was about eight by ten feet. The defendant sat in an "overstuffed chair" with Detective Ronchi in front of and facing him, and Sergeant Yeardi to the left of the detective.

At first, the defendant denied being in Portsmouth on the night of the murder. Detective Ronchi responded that he did not believe his story. He said that he was investigating a homicide and asked the defendant to sign a form consenting to a search of his home. After the detective read the form aloud and explained its meaning, the defendant stated that he understood the form, and he signed it at approximately 10:30 p.m.

The defendant then asked to change his statement. He said that he and Rockett had gone to Hampton on Friday night, June 28, that he had fallen asleep in the car on the way home, and that when he awoke there was a third person in the car. When the detective asked if the third person was Matthew Zola, the defendant replied that he "didn't want to be involved in this." Detective Ronchi then pushed his chair away to clear a path to the door of the room and told the defendant that he was not in custody and that he was free to leave. The defendant remained in his chair and did not ask to leave, so Detective Ronchi reinitiated conversation, telling the defendant that Rockett had told a different story. The detective stated again that he did not think that the defendant was being truthful. The defendant stated that if the detective was so sure that Rockett's statement was different, then he should allow Rockett to talk with the defendant face to face.

The detective then informed the defendant that witnesses on Pierce Island had seen a person matching the defendant's description get into a

green car with another person. At that point, the defendant asked if he had any rights. The detective responded that he was not in custody and free to leave, again pointing to the door. The defendant neither left nor asked to leave or be driven home.

Detective Ronchi reinitiated questioning, and the defendant admitted that he had been on Pierce Island on the night of June 28, and that he had participated in the robbery. He provided details of what transpired, admitting that he held the victim's head and told him that it would be "over in a minute." He stated that Rockett hit the victim and took items from the victim's pockets. He stated that he got scared and ran away, looking back to see Rockett kicking the victim. The defendant then returned to Concord.

Detective Ronchi told the defendant that he did not believe the defendant's account, but the defendant restated the same facts. The detective left the interview room and arranged for a meeting between the defendant and Rockett. At approximately 11:30 p.m., Rockett entered the interview room, telling the defendant to tell the police everything. The defendant exclaimed, "Chris, we had an agreement never to talk about this to anybody," and expressed concern that this was now a homicide. Detective Ronchi removed Rockett from the interview room after ten minutes.

At some point after the first meeting between Rockett and the defendant, the officers left the defendant alone in the interview room for about fifteen minutes. The defendant stood up and walked out the door. Sergeant Yeardi "ran into" the defendant in the hallway just outside the door, had a brief discussion with him and told him that someone would be with him in a few minutes.

Detective Ronchi returned to the interview room, and stated that he did not believe the defendant's story. The defendant maintained that all he did was hold the victim's head. At approximately 1:00 a.m., Detective Ronchi initiated a second meeting between the defendant and Rockett. No police officers were present for the second meeting; however, they monitored it from the observation room. The defendant was visibly upset and stated, "I can't believe you did this, Chris. I lied to save [us]." The defendant also stated, "If I did kick the man, I didn't kick him in the head."

Detective Ronchi next brought the defendant into a different interrogation room, and again told the defendant that he did not believe his statement. After another fifteen minutes of the detective stating that he did not believe the defendant, the defendant finally stated: "Me and Chris both hit the man and were kicking the man." He also admitted that he had covered the victim's mouth so that he could not scream. The defendant made this statement at approximately 1:30 a.m.

The defendant argues that because he was not warned of his constitutional rights prior to making the statement that he had also kicked the victim, his statement was admitted into evidence in violation of his State and federal constitutional rights against self-incrimination and rights to counsel. U.S. CONST. amends. V, VI; N.H. CONST. pt. I, art. 15. We address the defendant's State constitutional claim first, citing federal law only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983). Because "the Federal Constitution affords no greater protection than the State Constitution with regard to the defendant's rights under *Miranda,* we will not undertake a separate federal analysis." *State v. Ford,* 144 N.H. 57, 63 (1999).

*Miranda* warnings are required when a defendant is subjected to custodial interrogation. *Id.* at 62. Thus, the question before us is whether the defendant was in custody prior to admitting that he had participated in both the robbery and the murder of the victim. The ultimate determination of custody is a mixed question of law and fact. *Id.* "[A]lthough we will not overturn the factual findings [of the trial court] unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody *de novo*." *Id.* at 63.

"Custody entitling a person to *Miranda* protections during interrogation requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *State v. Hammond,* 144 N.H. 401, 403-04 (1999) (quotation omitted). "In the absence of formal arrest, the trial court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable person in the suspect's position would have understood the situation." *Id.* at 404. The court should consider, among other things, the "suspect's familiarity with his surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character." *Id.* (quotation omitted).

Based upon our *de novo* analysis, we agree with the trial court that the defendant was not in custody for *Miranda* purposes. The defendant was clearly not in custody at the beginning of his questioning. He went to police headquarters by his own agreement and without physical restraint. Two plain-clothes officers questioned the defendant. They did not display their weapons, and the defendant was not handcuffed.

Nor was the defendant in custody at any time during the course of the interview. The record does not support the defendant's argument that the character and tone of the interview substantially changed after the defendant admitted to participating in the robbery. The interview's duration was not excessive: it lasted for three and one-half hours. There

was no evidence of shouting or harsh tones at any time during the interview, and the defendant was never restrained.

Nor did the interview become custodial after the defendant "ran into" Sergeant Yeardi in the hallway and then returned to the interview room. Although the trial court's order stated that Sergeant Yeardi told the defendant to go back into the interview room, this finding is not supported by the testimony. Sergeant Yeardi testified that he had a brief discussion with the defendant and told him that someone would be with him in a few minutes. He explicitly testified that he neither blocked the defendant's path nor told the defendant to go back into the room.

While Detective Ronchi persistently told the defendant that he did not believe him, he also reminded the defendant that he was not in custody, and he told the defendant on at least three occasions that he was free to leave. There is no evidence that the defendant did not voluntarily accompany Detective Ronchi to the second interview room.

Given the repeated advice that he was free to leave, we conclude that a reasonable person in the defendant's position would not believe he was restrained to the degree associated with formal arrest. Therefore, the defendant was not in custody, and the trial court properly denied the defendant's motion to suppress.

## II. Speedy Trial

The defendant argues that by bringing him to trial four and one-half years after his arrest, the State denied his right to a speedy trial in violation of the Sixth Amendment to the United States Constitution and Part I, Article 14 of the New Hampshire Constitution. The defendant filed a motion to dismiss in November 2000 based upon a denial of his right to a speedy trial. The trial court denied the motion, concluding that "the totality of the circumstances mitigate against a finding of [a] speedy trial deprivation."

We address this issue first under the New Hampshire Constitution. *Ball*, 124 N.H. at 231-33. Because the Federal Constitution affords the defendant no greater protection, we need not undertake a separate federal analysis. *State v. Paone*, 142 N.H. 216, 218-19 (1997). We will refer to federal decisions only as an aid to our analysis. *Id.* at 219. "In reviewing the trial court's ruling, we defer to the trial court's factual findings unless those findings are clearly erroneous, and consider *de novo* the court's conclusions of law in respect to those factual findings." *Id.*

■ In considering whether a defendant's right to a speedy trial has been violated under the State Constitution, we apply the balancing test articulated in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). *See Paone*, 142

8

N.H. at 218. The test balances "four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant caused by the delay." *Id.* (quotation omitted).

The first factor, the length of the delay, is a triggering mechanism: we do not consider the remaining factors unless the delay is presumptively prejudicial. *State v. Fletcher*, 135 N.H. 605, 607 (1992). For the purposes of this case, a delay of over nine months is presumptively prejudicial. *Id.*

Analysis of the second factor requires that we assess why the trial has been delayed, to which party the delay is attributable and how much weight to give the delay. *See Humphrey v. Cunningham, Warden*, 133 N.H. 727, 735 (1990).

We place substantial emphasis on the last two factors. *Id.* at 736. Although we typically require a defendant to demonstrate actual prejudice from a delay to prevail on a speedy trial claim, "[w]hen a defendant does not — or cannot — articulate the particular harm caused by delay, we inquire whether the length and reason for the delay weigh so heavily in the defendant's favor that prejudice need not be specifically demonstrated." *Paone*, 142 N.H. at 220.

The first factor was clearly met: because the delay exceeded nine months, it triggers analysis of the remaining *Barker* factors. *See Fletcher*, 135 N.H. at 607.

The reason for the delay was that the State filed an interlocutory appeal challenging the trial court's order regarding the *mens rea* for accomplice liability to second degree murder. On February 24, 1997, the State appealed the superior court's ruling that the defendant could not be charged as an accomplice to second degree murder. We reversed the trial court's rulings on December 3, 1999. *Locke*, 144 N.H. at 348-49. Although the State prevailed, it filed a motion for reconsideration of the burden of proof. That motion was denied on October 30, 2000. In sum, the appellate process took three years and eight months. There is no evidence that in filing its appeal and motion to reconsider, the State acted unreasonably, or intentionally delayed its prosecution of the defendant. Thus, we must determine to whom this period of delay is chargeable, and how much weight it should be given in the *Barker* analysis.

In *United States v. Loud Hawk*, 474 U.S. 302, 316 (1986), the United States Supreme Court concluded that delays resulting from interlocutory appeals may be weighed in assessing a speedy trial claim. The Court noted that "there are important public interests in the process of appellate review," *id.* at 313, and "an interlocutory appeal by the Government

ordinarily is a valid reason that justifies delay." *Id.* at 315. The Court identified three factors to assess the purpose and reasonableness of the appeal: (1) the strength of the Government's position on appeal; (2) the importance of the issue in the posture of the case; and (3) the seriousness of the crime. *Id.*

■ Here, there is no evidence that the State acted in bad faith or with dilatory purpose. *Cf. id.* at 316. The State's position in the initial appeal was strong and dealt with an issue central to the case. The reversal by this court is *prima facie* evidence of the reasonableness of the State's action. *Cf. id.* Finally, the defendant's charged offenses were sufficiently serious to justify the restraints imposed. *Cf. id.* When the defendant sought release on bail on May 22, 2000, the trial court denied his motion, stating that the defendant's charges "are most serious and it is not unusual for persons indicted for second degree murder to be incarcerated on some type of high bail prior to their trial. This is particularly true in light of the defendant's criminal record." Having assessed the three *Loud Hawk* factors, we conclude that the cause for the delay in this case — the interlocutory appeal — was reasonable. Although weighed against the State, the delay should not weigh heavily against it. *See Barker,* 407 U.S. at 531; *Fletcher,* 135 N.H. at 608.

■ Regarding the third factor, the defendant's assertion of his right to a speedy trial, the record demonstrates that the defendant raised concerns about the delay on several occasions. We conclude that he asserted his right to a speedy trial, and this factor weighs in his favor.

■ The last factor, whether and to what extent the defendant suffered prejudice, requires us to consider the length of the delay. *See Doggett v. United States,* 505 U.S. 647, 654-58 (1992). "[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655. Delay is "part of the mix of relevant facts, and its importance increases with the length of delay." *Id.* at 656; *see id.* at 652 n.1. We will assume without deciding that the defendant awaited trial for fifty-five months — from his date of arrest, July 3, 1996, until his trial began on February 5, 2001. *See Humphrey,* 133 N.H. at 734 (period of delay begins to run when defendant is arrested).

■ Analysis of the prejudice factor also requires a re-examination of the State's actions because if the State pursues a defendant with "reasonable diligence," then a speedy trial claim is likely to fail, regardless of the length of delay, as long as the defendant cannot show specific prejudice to his defense. *Doggett,* 505 U.S. at 656.

 Here, the trial court found that the defendant did not suffer any prejudice: two witnesses whom the defendant could not locate at the time he filed his motion to dismiss were ultimately found and testified at trial; the co-defendant, whose original statement incriminated the defendant changed his account by the time of trial and testified that he, and not the defendant, hit and kicked the victim. On appeal, the defendant argues he was prejudiced by the fact that a number of witnesses' memories had faded, and the medical examiner who testified at trial was not the one who conducted the autopsy. These assertions do not amount to the prejudice required under the *Barker* analysis: the medical examiner testified that it is not uncommon to testify from the report of another medical examiner; and the "dimming of memories alone is insufficient to constitute prejudice for purposes of a speedy trial claim." *Humphrey*, 133 N.H. at 736. Since the State prosecuted this case with reasonable diligence, and because the defendant has not demonstrated actual prejudice, his speedy trial claim must fail. *Doggett*, 505 U.S. at 656; *Paone*, 142 N.H. at 220. We conclude from the *Barker* analysis that the defendant's right to a speedy trial was not violated.

### III. Cross-examination

Finally, the defendant argues that the trial court impermissibly limited his ability to confront and cross-examine a key police witness in order to effectively challenge the witness's credibility in violation of Part I, Article 15 of the New Hampshire Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

During cross-examination of Detective Ronchi, one of the State's principal witnesses, the defendant sought to introduce portions of his co-defendant's statement to the detective in order to impeach the detective's credibility. The defendant argued that he would either show that if the detective believed the statement, then that belief was unreasonable, or if the detective did not believe the statement, then the detective had lied to the defendant when he was questioning him. The trial court ruled that the defendant could cross-examine the detective regarding his interview techniques, whether or not he lied and whether or not he embellished the co-defendant's statement. The court ruled, however, that the substance of the co-defendant's statement should first be introduced through the co-defendant, who would be called as a defense witness, and that the detective would remain subject to recall. The defense conducted a thorough cross-examination of the detective without any further objections from the State. The defendant later elicited the content of the co-defendant's statement on direct examination of the co-defendant. The defendant did not, however, recall the detective.

■ We first address this argument under our State Constitution, and because the federal Confrontation Clause affords no greater protection than the State Confrontation Clause, we need not undertake a separate federal analysis. *State v. Bashaw*, 147 N.H. 238, 242 (2001). "The constitutional right to cross-examine adverse witnesses in criminal cases is fundamental and includes the right to impeach a witness's credibility through cross-examination." *Id.* "In determining the limits of cross-examination, a trial court must balance the prejudice, confusion, and delay of the proffered testimony against its probative value." *Id.* (quotation omitted). Although the trial court has broad discretion in determining the scope of cross-examination, "it may not completely deny a defendant the right to cross-examine a witness on a proper matter of inquiry." *State v. Newman*, 148 N.H. 287, 289-90 (2002) (quotation omitted). "Once a defendant has been permitted a threshold level of inquiry, however, the constitutional standard is satisfied, and the judge's limiting of cross-examination is measured against an unsustainable exercise of discretion standard." *Id.* at 290 (quotation and brackets omitted). "Thus, when the record reveals that a threshold level of inquiry was allowed, we will uphold the trial court's decision limiting the scope of further cross-examination unless the defendant demonstrates that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.*

We are not persuaded that the trial court erred in determining the scope of this cross-examination. The defendant cites three cases for the proposition that cross-examination designed to expose the witness's motive to fabricate must be permitted. *See State v. Etienne*, 146 N.H. 115, 118 (2001); *State v. Allison*, 134 N.H. 550, 557-58 (1991); *State v. Ramos*, 121 N.H. 863, 867 (1981). Those cases are easily distinguished because they involved cross-examination regarding a witness's motive to testify falsely at trial. As the State points out, the defendant does not argue that the co-defendant's statement to police would have demonstrated that the detective was lying at trial about his interrogation of the defendant. Evidence regarding Detective Ronchi's belief of the co-defendant's version of events, based on the content of the co-defendant's statement, is not probative of the detective's credibility at trial. *Cf. Bashaw*, 147 N.H. at 242.

■ We conclude that the trial court did not bar the defendant from making a threshold inquiry at trial into the detective's reliance on the co-defendant's statement. The trial court explicitly ruled that the defendant could cross-examine the detective regarding how he used the co-defendant's statement during his questioning of the defendant. Moreover, if the defendant was not satisfied with the scope of his first cross-examination of the detective, he could have recalled him after eliciting the

substance of the co-defendant's statement from the co-defendant. The defendant has not demonstrated that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. Thus we conclude that the trial court did not impermissibly limit the defendant's ability to challenge a State witness's credibility in violation of Part I, Article 15 of the New Hampshire Constitution.

The defendant did not brief the remaining issues raised in the notice of appeal; therefore, we deem them waived. *State v. Brewster*, 147 N.H. 645, 651 (2002).

*Affirmed.*

DALIANIS, J., concurred; MURPHY, C.J., and SMITH and GALWAY, JJ., superior court justices, specially assigned under RSA 490:3, concurred.