# United States Court of Appeals

## For the First Circuit

No. 05-1251

DANNY LOCKE,

Petitioner, Appellant,

v.

BRUCE W. CATTELL, WARDEN, NEW HAMPSHIRE STATE PRISON, and
KELLY A. AYOTTE, ATTORNEY GENERAL FOR THE STATE OF NEW HAMPSHIRE,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
[Hon. Paul Barbadoro, U.S. District Judge]

Before

Lipez, Circuit Judge,
Cyr, Senior Circuit Judge,
and Singal,[*] District Judge.

Christopher M. Johnson for appellant.
Kelly A. Ayotte, Attorney General, with whom N. William Delker, Senior Assistant Attorney General was on brief for appellees.

February 9, 2007

_____

[*]Of the District of Maine, sitting by designation.

**SINGAL, District Judge.** Danny Locke ("Locke") was convicted in New Hampshire Superior Court of conspiracy to commit robbery, felony robbery, first degree assault and second degree murder relating to the robbery and death of Roland Labranche. The Supreme Court of New Hampshire upheld the convictions. State v. Locke, 813 A.2d 1182, 1193 (N.H. 2002). Locke now appeals the district court's order denying his petition for writ of habeas corpus. A certificate of appealability was granted solely on the issue of whether Locke was in custody after he implicated himself in the robbery. Because the state court decision that Locke was not in custody at any point during the interview was not an unreasonable application of clearly established federal law, we affirm.

## I. BACKGROUND

We recount here only the relevant, undisputed facts related to the interview of Locke.[1] A statement of facts relating to the robbery and murder of Roland Labranche can be found in State v. Locke, 761 A.2d 376, 377-78 (N.H. 1999).

In the early morning hours of June 29, 1996, Roland Labranche was robbed and beaten to death on Pierce Island in New Hampshire. On July 2, 1996, Christopher Rockett ("Rockett") admitted his participation in the robbery and murder and

_____

[1] For a more detailed account of the interview see State v. Locke, 813 A.2d 1182, 1186-89 (N.H. 2002).

implicated Locke. Four police officers, dressed in plain clothes, drove in two unmarked police cars to Locke's residence, in Concord, New Hampshire. After Detective Ronchi and Sergeant Yeardi knocked on the door, Detective Ronchi identified himself and told Locke that he was investigating an incident that had occurred in Portsmouth. Locke agreed to accompany the officers to the State Police Headquarters ("Headquarters") after he dressed.

Locke was transported to the Headquarters in an unmarked police car, which he entered without assistance. Both at Locke's residence and en route to the Headquarters, Locke was told that he was not in custody and was free to leave. Locke and the officers arrived at the Headquarters shortly before 10:00 p.m. Locke exited the car. Upon arrival, Detective Ronchi led Locke past Rockett, who was standing outside the Headquarters with another officer, to a third-floor interview room. Again, Locke was told that he need not stay or speak with the police.

Initially, Locke denied being in Portsmouth on the night of June 28, 1996. Detective Ronchi responded by informing Locke that he did not believe Locke's story and that he was investigating a homicide. After consenting to a search of his residence, Locke asked to change his statement. Locke stated that he and Rockett had gone to Hampton Beach on the night of June 28, but that Locke had fallen asleep in the back of the car

on the way home. Locke further stated that when he awoke, a third person was in the car. When Detective Ronchi asked whether that person was Matthew Zola, Locke replied that "he [Locke] didn't want to be involved in this." Detective Ronchi responded by again informing Locke that he could leave and motioning toward the door, but Locke stayed seated and did not request to leave.

Detective Ronchi reinitiated conversation and informed Locke that Rockett had admitted being on Pierce Island on the night of the robbery and murder. Locke again stated that his only memory of that evening was leaving Hampton and falling asleep in the car. In addition, Locke requested to speak with Rockett. Detective Ronchi again stated that he did not believe Locke was being truthful and told Locke that witnesses on Pierce Island had seen two persons entering a car identified as the victim's. Locke then asked whether he had any rights. The detective stated that Locke was not under arrest, not in custody and he was free to leave at any time. Locke did not leave nor did he ask to leave or be driven home.

Again, Detective Ronchi initiated questioning. During this line of questioning, Locke admitted to being on Pierce Island on the night of June 28 and participating in the robbery of Roland Labranche with Rockett. Locke provided details of the robbery, stating that he knelt down, held the victim's head and told the victim that "it would all be over in a minute." Locke stated

that Rockett had knocked the victim to the ground, but that Locke had become afraid and ran away as Rockett was going through the victim's pockets. Locke stated that he had looked back to see Rockett kicking the victim, and that he soon thereafter returned to Concord without Rockett.

The detective again informed Locke that he did not believe his story and that Rockett had provided a different version of the events. Detective Ronchi then arranged a meeting between the petitioner and Rockett. Rockett entered the interview room where Locke, Detective Ronchi and Sergeant Yeardi were present and told Locke: "Danny, go ahead and tell them. They know everything. They knew everything before they got here." Locke responded by stating: "We had an agreement never to talk to anybody about this." Detective Ronchi then ended the meeting and removed Rockett from the interview room.

After the initial encounter with Rockett, Locke stood and walked into the hallway. Sergeant Yeardi "ran into" Locke in the hallway and had a brief discussion with Locke, during which he stated that someone would be with Locke in a few minutes. Sergeant Yeardi neither blocked Locke's path nor told him to go back into the interview room.

Next, Detective Ronchi returned to the interview room and again stated that he did not believe Locke was telling the whole truth. Locke continued to maintain that his only involvement was

in holding the victim's head and telling him it would all be over soon.

Detective Ronchi then initiated a second meeting between Locke and Rockett. Rockett was brought into the interview room by the police. Although no police officers were present in the interview room, the police monitored the conversation through an adjacent observation room and could observe both Locke and Rockett. During this meeting, Locke was visibly upset. After twenty minutes, the police ended the second meeting and Rockett was escorted out of the interview room.

After this second meeting with Rockett, Detective Ronchi asked Locke to accompany him into another interview room, and stated that Locke did not have to go with him. Locke agreed to accompany the detective into the second interview room. During this meeting, Locke admitted to participating in both the robbery and the murder. He stated: "Chris and I both were kicking the man, and that I knelt down and put my hand over the man's mouth to prevent him from screaming." After this statement, the petitioner indicated that he did not want to talk anymore and the interview was concluded. Locke was then arrested. At no point prior to either admission was Locke advised of his Miranda rights.

On February 14, 2001, a jury found Locke guilty of conspiracy to commit robbery, felony robbery, first degree assault and second degree murder. Locke's statements implicating

-6-

himself in the robbery and murder were admitted at trial.  The New Hampshire Supreme Court upheld the convictions.  Locke, 813 A.2d at 1193.  In affirming that Locke was not in custody at any point during the interview, the New Hampshire Supreme Court stated: "The defendant was clearly not in custody at the beginning of his questioning. . . . Nor was the defendant in custody at any time during the course of the interview."  Id. at 1188-89.  The New Hampshire Supreme Court emphasized that Locke repeatedly was told that he was not in custody and that he was free to leave. Id. at 1189.

On April 29, 2004, Locke filed a petition for writ of habeas corpus in federal court.  The district court entered its judgment against Locke on January 14, 2005 and this timely appeal followed.  A certificate of appealability was granted solely on the issue of whether Locke was in custody after he implicated himself in the robbery.

## II.  STANDARD OF REVIEW

We review the federal district court's denial of Locke's petition for writ of habeas corpus de novo.  Johnson v. Norton, 249 F.3d 20, 26 (1st Cir. 2001) (stating that review of a federal district court's legal determinations is de novo).  Our review, however, like that of the district court, is ultimately governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d) (2006).

Under AEDPA, an application for writ of habeas corpus by a person in state custody that was adjudicated on the merits will not be granted unless the decision of the state court "resulted in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[2]  Id. § 2254(d)(1).  Clearly established federal law means "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 412 (2000).

In his petition, Locke asserts that the state court decision was an unreasonable application of clearly established federal law.  A state court decision is an "unreasonable application" of federal law when "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  It is not sufficient for the federal court to determine that the state court judgment was incorrect or erroneous; rather, the application of the law must be objectively unreasonable.  See id. at 411; accord Castillo v. Matesanz, 348 F.3d 1, 9 (1st Cir. 2003).

---

[2]Although there are additional grounds for relief under AEDPA, Locke does not assert that the state court decision was "an unreasonable determination of the facts in light of the evidence" nor does he argue that the decision was "contrary to . . . clearly established Federal law."  See 28 U.S.C. § 2254(d).

-8-

Furthermore, in determining whether a state court decision is an "unreasonable application" of clearly established federal law, the specificity of the legal rule must be considered. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). As the Supreme Court indicated in Yarborough, where the legal test is specific, the range of reasonable judgments is narrow. Id. Where, however, the legal test is general, there is a broader range of reasonable judgments. Id. "Applying a general standard to a specific case can demand a substantial element of judgment. . . . The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Id. Therefore, where the legal rule is general and review of the state court decision is under the deferential standard of § 2254(d)(1), state courts have substantial leeway in reaching a reasonable decision. See id. at 665.

## III. THE CUSTODY DETERMINATION

In Miranda v. Arizona, the Supreme Court first recognized that warnings alerting a person as to his constitutional rights must be given prior to custodial interrogations. 384 U.S. 436, 458 (1966). A person must therefore be "in custody" before Miranda warnings are due. Thompson v. Keohane, 516 U.S. 99, 102 (1995). The Court in Miranda noted that the term "custodial interrogation" signified "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant

-9-

way." 384 U.S. at 444. In Thompson v. Keohane, the Supreme Court explained the process courts must use to make the custody determination:

> Two discrete inquiries are essential to the ["in custody"] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

516 U.S. at 112 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). The subjective views of the interrogating officers or the person being interviewed have no bearing on this inquiry. Yarborough, 541 U.S. at 663.

Turning to the present case, we must determine whether the state court determination that Locke was not in custody was an unreasonable application of this clearly established federal test for custody determination. In Yarborough, the Supreme Court indicated that the custody determination is a general test, where substantial judgment is demanded in applying the law to the facts of a given case. Id. at 665. State courts, therefore, are provided with ample leeway in reaching a reasonable decision. See id.

Locke concedes that he was not in custody at the beginning of the interview. This is supported by the fact that Locke agreed to accompany the plain clothed officers to the

Headquarters and was told numerous times that he did not have to speak with them. The central inquiry, then, is whether Locke was in custody after admitting his participation in the robbery.

In this close case, certain facts weigh in favor of finding that Locke was in custody during the latter portion of his interview at the Headquarters. Locke repeatedly was confronted with his co-defendant's statements implicating him in the robbery and murder, and he twice met with Rockett face-to-face while the police monitored the conversation. See, e.g., Tankleff v. Senkowski, 135 F.3d 235, 244 (2nd Cir. 1998) (finding a suspect "certainly" in custody after the police confronted the suspect with a statement by the victim implicating him in the crime). But cf. Oregon v. Mathiason, 429 U.S. 492, 495-96 (1977) (holding that a police officer's false statement regarding incriminating fingerprints at the scene of the crime did not transform the interview into a custodial interrogation). Similarly, Detective Ronchi continually stated that he did not believe Locke was telling the truth. See Stansbury v. California, 511 U.S. 318, 324-25 (1994) (finding that an officer's suspicions conveyed to a suspect may bear upon the custody determination). But see Yarborough, 541 U.S. at 664 (considering the police officer's appeal to defendant's interest in telling the truth when evaluating factors that weighed against a finding that defendant was in custody). In addition, by the time Locke made the admission to participating in the robbery, it was late at night

-11-

in a building generally closed to the public at that time of day. See United States v. Nishnianidze, 342 F.3d 6, 13-14 (1st Cir. 2003) (stating that the early morning hour tended toward a finding of custody).  In the end, the interview lasted for more than three hours.  See Yarborough, 541 U.S. at 665 (contrasting the thirty minute non-custodial interview in Oregon v. Mathiason, 429 U.S. 492, 495 (1977), with the two hour interview of Alvarado, which pointed towards a custodial interrogation).  But see United States v. Pagan-Santini, 451 F.3d 258, 263 (1st Cir. 2006) (finding defendant not in custody where the interview lasted nine hours and defendant rejected breaks or a deferral of questioning to a second day).  Finally, when Locke "ran into" Sergeant Yeardi in the hallway outside the interview room, he was told that someone would be with him in a few minutes.

Ultimately, Locke asserts that his admission that he was involved in the robbery necessarily transformed the interview into a custodial interrogation.  Indeed, several state courts have found custodial interrogations following an admission.  See, e.g., Jackson v. State, 528 S.E.2d 232, 235 (Ga. 2000) ("A reasonable person in [defendant's] position, having just confessed to involvement in a crime in the presence of law enforcement officers would, from that time forward, perceive himself to be in custody . . . ."); Commonwealth v. Smith, 686 N.E.2d 983, 987 (Mass. 1997) ("[A]fter the defendant told the police that he was there to confess to the murder of his girl

-12-

friend, given the information the police already had received about the murder, we conclude that if he had wanted to leave at that point, he would not have been free to do so."); People v. Ripic, 587 N.Y.S.2d 776, 782 (N.Y. App. Div. 1992) ("[I]t is utter sophistry to suggest that a person in defendant's position, having made such an incriminating statement to police officers concerning the very homicide they were investigating, would feel that she was not under arrest and was free to leave."). Nonetheless, no Supreme Court case supports Locke's contention that admission to a crime transforms an interview by the police into a custodial interrogation.  Therefore, there is no clearly established federal law on which to base a finding of unreasonableness.  See, e.g., Carey v. Musladin, 127 S.Ct. 649, 654 (2006) ("Given the lack of holdings from [the Supreme Court] regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonably applied clearly established Federal law.'" (quoting 28 U.S.C. § 2254(d)(1))); Stansbury, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.").

Because Yarborough was decided after the New Hampshire Supreme Court decision, Locke, 813 A.2d at 1182, it is not clearly established federal law for purposes of our review.  See

-13-

Williams, 529 U.S. at 412.  Nonetheless, the facts of Yarborough are instructive.  In Yarborough, during an interview with a Los Angeles County Sheriff's detective, the defendant, Michael Alvarado, initially denied any involvement in a carjacking and murder.  541 U.S. at 656.  Unpersuaded by the denial, the detective encouraged Alvarado to tell the truth.  Id. at 656-57.  Alvarado first admitted his participation in the carjacking but denied any knowledge of a gun or the murder.  Id. at 657.  After the detective again appealed to Alvarado's sense of honesty and the need to bring the victim's killer to justice, Alvarado confessed to knowing that the other carjacker had a gun and to helping hide the gun after the shooting.  Id. at 657-58.  The Supreme Court upheld the state court's determination that Alvarado was not in custody.  Id. at 665.

In the absence of clearly established federal law on this issue, we cannot say that the state court was unreasonable in its decision that Locke was not in custody.  Weighing against the already outlined factors suggesting a custodial interrogation are facts tending to show that the tenor of the interview did not change after the initial admission and that a reasonable person in Locke's position would continue to believe that he was free to terminate the interview and leave.  Most significantly, Locke was told at least five times that he did not have to speak with the police and that he was free to leave.  See United States v. Muegge, 225 F.3d 1267, 1271 (11th Cir. 2000) (finding a non-

-14-

custodial interview primarily because the suspect was told directly that he was free to leave); United States v. Lanni, 951 F.2d 440, 442-43 (1st Cir. 1991) (indicating that statements by questioning officers that defendant was free to leave tend against a finding of custody). Although after the initial admission, Locke was not again explicitly told he was free to leave, he was not prohibited from leaving or terminating the interview. Further, when prior to the initial admission, Locke twice expressed hesitation in speaking with the police, he was told that he was free to terminate the interview and leave.

When Locke ran into Sergeant Yeardi in the hallway outside the interview room, his path was not blocked nor was he told to return to the interview room. See Nishnianidze, 342 F.3d at 14 (indicating that the lack of restraint on defendant's movement favored a finding that defendant was not in custody); United States v. Griffin, 922 F.2d 1343, 1349, 1350-51 (8th Cir. 1990) (providing that a suspect's unrestrained freedom of movement "would tend to mitigate the existence of custody at the time of questioning"). Further, Locke elected to accompany an officer into a second interview room after being given the choice. See id.

If this case were before us on de novo review, we might well reach a different result. We believe it likely that a reasonable person would not have felt that he was at liberty to terminate the interrogation and leave after confessing to a violent crime

and learning that a co-defendant has implicated him. Reluctantly, however, we conclude that such a holding by the state court is not an unreasonable application of clearly established federal law. Thus, we are constrained by the deferential standard of review to affirm the state court's determination that Locke was not in custody. "Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court applied [the law] incorrectly." Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam). In the absence of any case from the Supreme Court supporting Locke's contention that confession to a serious crime transforms an interview by the police into a custodial interrogation, we cannot say that the state court's determination was an unreasonable application of clearly established federal law. See, e.g., Carey v. Musladin, 127 S.Ct. 649, 654 (2006).

**IV. CONCLUSION**

For these reasons, the decision of the district court is **affirmed.**