**UNITED STATES of America**

v.

**William DAUBMANN and Donna Daubmann, Defendants.**

**No. 05–30067–MAP.**

United States District Court,
D. Massachusetts.

Feb. 21, 2007.

Vincent A. Bongiorni, Springfield, MA, Scott Evans Skolnick, Feeding Hills, MA, for Defendants.

*MEMORANDUM AND ORDER RE-GARDING DEFENDANTS' MOTIONS TO SUPPRESS (Dkt. Nos. 28, 29 and 48)*

PONSOR, District Judge.

## I. *INTRODUCTION*

Defendants William and Donna Daubmann, who are charged with twelve counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1), have filed three motions to suppress documents and statements obtained by IRS agents during a search of their home and business on August 28, 2002.

The court heard argument on Defendants' Motion to Suppress Physical Evidence (Dkt. No. 29) on December 19, 2006 and issued its memorandum denying the motion in part on December 20, 2006 (Dkt. No. 40). Two aspects of that motion, the court found, required further submissions: (1) Defendants' argument that the agents ignored limitations initially set by the Magistrate Judge on the time-frame of the documents to be seized, and (2) Defendants' argument that the agents exceeded the approved physical boundaries of the search.

On January 16 and 17, 2007 the court heard testimony on Defendants' Motion to Suppress Statements (Dkt. No. 28). Following the evidentiary hearing, the court concluded that Defendants' statements during interrogation at the time of the search were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court therefore allowed the Motion to Suppress by oral ruling.

Defendants thereafter filed their third Motion to Suppress (Dkt. No. 48), contending (among other things) that evidence obtained on the authority of an amended search warrant based on the suppressed statements was the "fruit of the poisonous tree" and should also be suppressed.[1]

This memorandum will do three things. First, it will detail the court's rationale—set forth generally in the oral ruling following argument on January 17, 2007—for barring admission of the statements allegedly made by Defendants during the search on August 28, 2002, as requested by Defendants' Motion to Suppress Statements (Dkt. No. 28). Second, it will deny Defendants' Amended Motion to Suppress (Dkt. No. 48) and permit the government to offer into evidence documentary materials seized based on the amended search warrant, even though the affidavit in support of this amended warrant relied on these suppressed statements. Third, it will deny the remaining portions of Defendants' Motion to Suppress Physical Evidence (Dkt. No. 29).

## II. *FINDINGS OF FACT*

On August 26, 2002, Chief Magistrate Judge Kenneth Neiman issued search warrants for Defendants' home at 135 Silver Lake Drive in Agawam, Massachusetts and for bathroom remodeling and storage businesses they owned and operated at 646 Springfield Street in Agawam, Massachu-

---

1. Defendants' original Motion to Suppress Statements (Dkt. No. 28) also sought suppression not just of the statements themselves but of evidence "derived therefrom." The amended motion (Dkt. No. 48) reaffirmed this broader goal.

setts, called "Mr. Shower Door" and "Unique Storage Systems." Probable cause for the warrants was almost entirely based on information provided to the Internal Revenue Service by a former bookkeeper of the Daubmanns who had worked in their businesses from 1998 to 2000.

The original warrant application sought permission to search for and seize pertinent documents from 1998 through the date of the search in August 2002. Judge Neiman declined to give the agents this authority, limiting the scope of the warrants to business records compiled during the 1998–2000 time frame. Upon a request for reconsideration by the government, Judge Neiman explicitly declined to expand the temporal scope of the warrant beyond this three-year period.

At approximately 6:50 a.m. on August 28, 2002, agents of the IRS Criminal Investigations Division executed the warrant for the Daubmanns' home. The IRS agent supervising the search agreed with defense counsel that one reason for initiating the search at this hour was the "shock and awe" engendered in the search targets by the agents' early arrival. The court finds that this was, in fact, one of the goals of the timing of the search.

The strategy worked. William Daubmann had just gotten up from bed and was walking across the living room, dressed in boxer undershorts and t-shirt, when the doorbell rang. When Daubmann opened the front door and looked out, he was confronted by ten to twelve IRS agents. The lead agent quickly identified himself and served Defendant with a copy of the warrant. The search team of a dozen or so men and women then entered through the front door in what Defendant credibly described as "a mad rush." All the agents were armed, but none had a weapon drawn.

Two male agents approached Daubmann saying, in words or effect, "You need to come with us. We need to ask you some questions." The agents escorted Daubmann to an enclosed drawing room at the front of the house and ordered him to sit down. Daubmann was aware that his wife was still sleeping and was concerned that she would be alarmed by the crowd of strangers in their home. When he attempted to leave the drawing room to inform her of what was going on, the agents physically blocked the drawing room door and ordered Daubmann to remain. Defendant was frightened and reasonably concluded based on the agents' actions that he was not free to leave.

During the next thirty to forty-five minutes, the agents continuously detained Defendant in the room and questioned him pointedly about matters relevant to their tax investigation. Defendant was in his undershorts throughout this interrogation and was never given the opportunity to dress.

When Daubmann asked the agents if he should call an attorney, they declined to respond. Daubmann was never informed of his right to counsel or of his right to appointed counsel if he could not afford an attorney. Moreover, he was not told that his statements could be used against him, or that he had a right not to answer questions. As a result of this tactic, the agents were able to elicit a number of possibly incriminating statements from him.

Eventually, Daubmann was permitted to call his accountant while the agents stood by in a position to monitor the conversation. After this, Daubmann declined to answer further questions. Agents then escorted him to a dressing room adjoining his bedroom where he was finally allowed to put on some clothes.

While Daubmann was being questioned in the drawing room, three agents awakened the Daubmanns' 29–year–old son Keith in his second-floor bedroom. They

got him out of bed and, as with his father, did not allow him to dress. The agents escorted Keith, clad in his underwear, from the second floor to the basement of the house. While being led through the first floor, Keith noticed his mother seated on the living room sofa in her nightclothes, flanked by two female agents. He repeatedly called out to ask her what was going on, and she responded that she had no idea.

In the basement, Keith Daubmann was questioned by the agents and eventually ordered to return to the second floor to open a safe located in his brother's bedroom. He was never told that he was free to leave, never allowed to dress until the questioning concluded, and was, to use his word, "petrified" through the entire episode.

Donna Daubmann was in bed asleep when she felt an "abrupt" hand on her shoulder. She awoke to find two unknown women looming over the bed. When she asked who they were, she was told they were IRS agents and they were there to ask her some questions.

Donna Daubmann immediately called out for her husband, but was informed by the agents that he was being questioned and that she would not be permitted to see or speak to him. Donna Daubmann then got out of bed, wearing only a thin white T-shirt, suitable for sleeping but not for outdoor use, with no brassiere, a pair of underpants and a "shortie" type sleepwear bottom. She was not given the opportunity to put on ordinary clothes.

She then asked to use the bathroom and was surprised and rather humiliated by the fact that one of the female agents insisted on standing next to her while she used the toilet. Her situation was at this point complicated by the fact that she realized she was experiencing the onset of her menstrual period. In her extreme nervousness, and with the agent standing nearby, Daubmann neglected to apply a sanitary pad or tampon.

In this condition, Daubmann was escorted by the agents through the bedroom and ordered to follow them into the living room, where she was directed to take a seat on the sofa. A photograph of this scene offered into evidence during the evidentiary hearing, while it shows only part of Donna Daubmann, confirms that she was scantily clad at this point, with her legs crossed, as she testified, to conceal her embarrassment at her menstrual condition.

Once in the living room, Daubmann was flanked by the agents and interrogated aggressively for thirty to fifty minutes. During this time Defendant was never informed that she was free to leave, that she could decline to answer questions, that she had a right to counsel, or that her answers to the questions could be used against her. The agents informed Defendant that they "needed" to ask her questions, and she reasonably concluded both that she would not be permitted to leave the area and that she had no choice but to answer. When she was ordered to open a second safe in the house, she complied. It was only after the questioning ceased that Donna Daubmann was permitted to change out of her nightclothes and get dressed.

During the questioning, Donna Daubmann made numerous statements covering the period from 1998 to 2002 that the government alleges were inculpatory and that it now wishes to offer at trial.

Moreover, based largely on Donna Daubmann's statements, IRS Special Agent Paul Zaiken prepared and presented a supplemental affidavit to Chief Magistrate Judge Neiman seeking to expand the scope of the warrants to permit the seizure of business records not only from 1998 to 2000, as originally authorized, but through the date of the search. Later that after-

noon, Chief Magistrate Judge Neiman issued the requested supplemental search warrants.

### III. *LEGAL ANALYSIS*

#### A. *The Motion to Suppress the Statements (Dkt. No. 28).*

The Fifth Amendment provides that "no person. shall be compelled in any criminal case to be a witness against himself." While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," *United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), the Supreme Court in *Miranda* "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under these circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forego those rights." *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

■ *Miranda* defined custodial interrogation[2] as questioning "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." 384 U.S. at 444, 86 S.Ct. 1602. In refining the *Miranda* test, the Supreme Court defined custody largely in Fourth Amendment terms, identifying the "ultimate inquiry" as whether the person interrogated was subjected to a "formal arrest or [a] restraint on [his or her] freedom of

movement to the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). As within the Fourth Amendment context, the test is objective. "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *see also Yarborough v. Alvarado*, 541 U.S. 652, 666–667, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). In short, if a "reasonable person in [the Daubmanns'] position would have believed that he [or she] was actually in police custody and [was] being constrained to a degree associated with formal arrest," then custody has been established for *Miranda* purposes. *United States v. Trueber*, 238 F.3d 79, 93 (1st Cir.2001).

■ A court examines such factors as "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect and the duration and character of the interrogation." *United States v. Fornia–Castillo*, 408 F.3d 52, 63 (1st Cir.2005).[3] The list, however, is not exclusive, nor is any single factor necessarily dispositive.

In *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), decided fifteen years after *Miranda*, the

---

**2.** Custody and interrogation are, of course, separate concepts. Custody is the only point at issue here. The government concedes that the Daubmanns were "interrogated" in the *Miranda* sense of the term. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

**3.** The Supreme Court had previously noted the significance of an environment that is "police dominated." *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82

L.Ed.2d 317 (1984). The Eighth Circuit interpreted this factor to include "whether the police assume control of the interrogation site and 'dictate the course of conduct followed by the suspect' or other persons at the scene." *United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir.1990) (citation omitted), *cited with approval in Locke v. Cattell*, No. 05–1251, 2007 WL 431162, at *6 (1st Cir. Feb.9, 2007); *United States v. Lanni*, 951 F.2d 440, 443 (1st Cir.1991).

Supreme Court held that a search warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. 2587. The Court held that the detention is justified by the substantial law enforcement interests in preventing flight, minimizing the risk of harm to the officers executing the warrant, and facilitating the orderly completion of the search. *Id.* at 702–03, 101 S.Ct. 2587. The Court also opined that under normal circumstances, most occupants would want to be present during the execution of a search warrant and that "self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." *Id.*

■ The Court, however, cautioned that the detention authorized during the execution of a search warrant should not be "exploited by the officers or unduly prolonged in order to gain more information, because the information the officers seek will normally be obtained through the search and not through the detention." *Id.* at 701, 101 S.Ct. 2587. In other words, "officers conducting a lawful search of a person's home are not permitted to use the suspect's detention to their official advantage by attempting to extract self-incriminating statements from the suspect." *United States v. Mittel–Carey,* 456 F.Supp.2d 296, 303 (D.Mass.2006) (citation omitted).

■ While the Daubmanns were questioned in the surroundings of their own home, a factor that ordinarily militates against a finding of custody, an otherwise familiar setting may be transformed into an isolating and coercive environment by an overbearing police presence. *Griffin,* 922 F.2d at 1355.

In this case, the circumstances rightly persuaded Defendants, and would have persuaded any reasonable person, that they were essentially in custody. They were kept physically separated from one another and their freedom of movement was blocked.[4] They were under the constant guard of agents who, as in the case of Donna Daubmann, insisted on maintaining their watch in even the most intimate moments. Adding to the coercive atmosphere was the shocking fact that all three Daubmanns were questioned while in a humiliating state of undress and were not permitted to change into more appropriate attire until the agents concluded their questioning.

Under the circumstances, no reasonable person in the Daubmanns' situation would believe that he or she was truly free to leave or had any choice but to cooperate with the agents and respond to questions. Therefore, *Miranda* warnings should have been given prior to any interrogation; because they were not, the Daubmanns' statements must be suppressed.

**B. *The Supplemental Motion to Suppress (Dkt. No. 48).***

The Supreme Court in *Miranda* "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *Quarles,* 467 U.S. at 654, 104 S.Ct. 2626. A coerced statement in the *Miranda* sense is not, however, necessarily an involuntary statement. The

---

**4.** "The Supreme Court in *Miranda* noted that isolating a subject from others, who might lend moral support to the person questioned and thereby prevent inculpatory statements, was a technique of psychological coercion." *United States v. Beraun–Panez,* 812 F.2d 578, 582 (9th Cir.1987).

Court has always recognized that the issue of voluntariness is analytically distinct from the issue of the validity of a waiver of *Miranda* rights. A statement, as the Court recognized early in its *Miranda* jurisprudence, may be voluntary and yet not the product of a knowing and intelligent waiver of constitutional rights. *Edwards v. Arizona*, 451 U.S. 477, 483–84, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Conversely, a waiver may be perfectly valid and yet the ensuing confession involuntary. *Withrow v. Williams*, 507 U.S. 680, 712, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (O'Connor, J., dissenting) ("It is entirely possible to extract a compelled statement despite the most precise and accurate of warnings.")

Voluntariness has been defined by the Supreme Court as "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). Outside of the *Miranda* context, the Court's voluntariness inquiry has focused on examples of overbearing police conduct. The Court has condemned the extraction of confessions by torture, *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), physical duress, *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), sleep deprivation, *Greenwald v. Wisconsin*, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (per curiam), psychotropic drugs, *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), threats against family members, *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), threats of death or physical harm to a suspect, *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967), unrelentingly intensive interrogation, *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), and trickery "offensive to a civilized system of justice," *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

When a claim of involuntariness is raised, the court must " 'examine the entire record and make an independent determination of the ultimate issue of voluntariness.' " *United States v. Boskic*, 04–10298 DPW 2006 WL 1540488, at *12 (D.Mass. June 2, 2006) (citing *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976)). "[O]nly confessions procured by coercive official tactics should be excluded as involuntary." *United States v. Genao*, 281 F.3d 305, 310 (1st Cir.2002) (citation omitted). To find that officials used coercive tactics, the facts must "add up to 'police overreaching.' " *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). "There is an enormous difference . . . between the uncertain consequences of disclosure of a guilty secret, freely given in response to an unwarned but noncoercive question, and the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will." *United States v. Marenghi*, 109 F.3d 28, 32 (1st Cir.1997) (citing *Oregon v. Elstad*, 470 U.S. 298, 313, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

While the Daubmanns were interrogated in a custodial setting, and were therefore entitled to be advised of their rights under *Miranda*, there is no suggestion that the agents made threats of extrajudicial violence, engaged in trickery or deceptive conduct, or made promises of leniency in order to induce the Daubmanns into making incriminating statements. By all accounts, the agents' questioning, while pointed, was polite. *Compare Lynumn*, 372 U.S. at 534, 83 S.Ct. 917 (involuntary confession made after police threatened to cut financial aid for infant children); *United States v. Rosario–Diaz*, 202 F.3d 54, 69–70 (1st Cir.2000) (voluntary waiver after six hours of interrogation of individual

with very low I.Q.); *United States v. Swint*, 15 F.3d 286, 290–91 (3rd Cir.1994) (involuntary confession resulting from misleading guarantee that statements would not be used against Defendant); *Griffin v. Strong*, 983 F.2d 1540, 1543–44 (10th Cir. 1993) (promise of leniency made in exchange for involuntary statement). In sum, because the Daubmanns' statements were not procured by impermissibly coercive police tactics, they were voluntary despite the failure of the agents to administer *Miranda* warnings.

■ As noted above, the supplemental search warrants issued by Chief Magistrate Judge Neiman on August 28, 2002, authorizing the seizure of the post–2000 business records, were based primarily on Donna Daubmanns' unwarned but voluntary statements. The question before the court is whether these statements were properly considered by the Magistrate Judge.[5]

■ It is well established that "[t]he *Miranda* presumption does not require that the fruits of unlawfully obtained confessions be discarded as inherently tainted." *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The Supreme Court has in several significant contexts refused to apply "the fruit of the poisonous tree" doctrine to voluntary statements in violation of *Miranda*.[6] *See Harris v. New York*, 401 U.S. 222, 224–226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (impeachment of a defendant's trial testimony with voluntary statements obtained in violation of *Miranda); Oregon v. Hass*, 420 U.S. 714, 722, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (voluntary, unwarned statements used for impeachment "provide valuable aid to the jury in assessing the defendant's credibility"); *Michigan v. Tucker*, 417 U.S. 433, 449–450, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (identity of a witness discovered during an un-*Mirandized* but otherwise voluntary interrogation).

■ In *Elstad*, the Court stated that it would be "an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." 470 U.S. at 307, 105 S.Ct. 1285. Most recently, in *United States v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004), Justice Thomas, writing for a plurality, concluded that the Self–Incrimination Clause is not implicated by the introduction at trial of physical evidence discovered as the result of a defendant's voluntary, but unwarned statements. In the plurality's view, the Self–Incrimination Clause of the Fifth Amendment sweeps more narrowly than the Fourth Amendment exclusionary rule and "limits the relevant category of compelled incriminating communications [that must be suppressed] to those that are 'testimonial' in character.... [Thus,] [t]he Clause cannot be violated by the introduction of non-testimonial evidence obtained as a result of voluntary statements." *Id.* at 637, 124

---

**5.** That the statements themselves, particularly those of Donna Daubmann, were sufficient to establish probable cause is not a matter of dispute.

**6.** The roots of the poisonous tree doctrine are traced to a Fourth Amendment decision, *Wong Sun v. United States*, 371 U.S. 471, 83

S.Ct. 407, 9 L.Ed.2d 441 (1963). While application of the doctrine is sometimes said to be automatic, as *Wong Sun* itself made clear, there is no "but for" test. Suppression is appropriate only where the fruits of a Fourth Amendment violation have been harvested through an exploitation of the "primary illegality." *Id.* at 488, 83 S.Ct. 407.

S.Ct. 2620. The "complete and sufficient" remedy for a *Miranda* violation is the exclusion of unwarned statements in the government's case-in-chief at trial. *Id.* at 641–42, 124 S.Ct. 2620.

In this case, unlike in *Patane*, where the police recovered a gun as a result of unwarned statements, the Daubmanns' statements were used to obtain an expanded search warrant. Nonetheless, "this difference is immaterial." *United States v. Phillips*, 468 F.3d 1264, 1266 (10th Cir. 2006) (holding that DNA evidence, obtained pursuant to a search warrant, was admissible despite fact that supporting affidavit relied on a defendant's statements offered in a custodial environment without a *Miranda* warning).

Because the Magistrate Judge properly relied on the Daubmanns' voluntary statements in his determination of probable cause, the supplemental search warrants issued on August 28, 2002 had a lawful basis, and the documents seized pursuant to them will not be suppressed.

**C. *The Motion to Suppress Physical Items (Dkt. No. 29).***

 As noted in the introduction to this memorandum, two issues remain regarding the agents' seizure of physical items, mainly documents, during the August 28, 2002 search. These may now be quickly disposed of. First, the government's submissions confirm that reasonable steps were taken by the agents during the initial phase of the search to confine their seizures to documents generated during the limited time frame originally permitted, 1998–2000. Moreover, any documents seized beyond this time frame would inevitably have been obtained by the agents during the latter phase of the search when the time frame was expanded by the Magistrate Judge up to 2002.

Thus, Defendants are not entitled to suppression of any documents based on a failure to respect the time limits set by the Magistrate Judge.

Second, suppression is similarly not mandated by any improper expansion of the physical limits of the search. Defendants have not specified, in any way the court can recognize, the precise documents allegedly improperly seized from Defendants' parents' apartment, nor does the court have any indication that materials seized from this area will be offered by the government into evidence at the trial. This ruling is made without prejudice to a further motion to suppress directed at some specific document or other item that Defendants wish to argue should be excluded, based on a seizure that exceeded the permitted physical boundary of the search.

**IV. *CONCLUSION.***

For the foregoing reasons, Defendants' motion to bar the government from any affirmative use in its case in chief of the statements they made during the execution of the search warrant (Dkt No. 28) is hereby ALLOWED. The amended motion to exclude physical evidence seized pursuant to the supplemental search warrants issued on August 28, 2002 (Dkt. No. 48) is DENIED.[7] Finally, the earlier motion to suppress physical items, already denied in part (Dkt. No. 29), is hereby DENIED *in toto.*

The government has filed an interlocutory appeal of the court's ruling allowing the Motion to Suppress Defendants' Statements (Dkt. No. 28). Absent application from the government or Defendants, the court will take no further action in this

---

**7.** Dkt. No. 48 also raised various other bases for suppression already addressed by the

court. The denial of this motion extends to all these grounds.

case until the First Circuit has made its ruling on the appeal.

It is So Ordered.